[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter comes before the court as a limited contested dissolution of a marriage which occurred between the parties in Bethel, Connecticut, on October 2, 1982. Both parties have resided continuously in this state for at least twelve (12) months prior to the date of the filing of this complaint. No CT Page 10025 minor children were born issue of this marriage. No minor children were born to the plaintiff since the date of the marriage. Neither party has received aid from the State of Connecticut or any municipality. The court finds that the marriage has broken down irretrievably and a decree may enter on the grounds of irretrievable breakdown.
The plaintiff commenced this action in April of 1993. In May of 1993, the plaintiff's motion to enjoin the defendant pendente lite, until further order of the court, from removing, transferring, cancelling, assigning, disposing of and/or selling, encumbering or liening cash, savings accounts, checking accounts, other bank accounts, personal property, motor vehicles and real property presently available or accessible to him was granted by agreement and became an order of the court (Riefberg, J.).
Right after the marriage, the parties moved into a small three room home on North Avenue in Bridgeport, next door to the defendant's mother. After living there a few months, the plaintiff realized that "it was not a great area." The residence was located a few blocks from the North Avenue jail. There was gang activity in the area. The sounds of gunshots was not unusual. She found vagrants sleeping in the yard. A homeless person lived in a box next door for almost a year. He spent his days walking up and down the street screaming at the traffic. Eventually, the plaintiff reached the point where she was afraid to answer the door. After an occasion when someone shot at them on a trip from the Bridgeport train station, the plaintiff discussed with the defendant relocating to a better neighborhood. The search for alternate housing began in 1984, but nothing ever materialized.
The financial arrangements between the parties were fairly simple. The plaintiff paid for all the food, household items, her own car payments, her auto and medical insurance, her clothes, her own airfare for vacations and one-half of vacation lodgings. There was one joint savings account funded with cash wedding gifts which was primarily used for the honeymoon. According to the plaintiff, there was little information offered by the defendant regarding his finances. Although the plaintiff assisted him in his business by editing letters, posters and fliers, stuffing envelopes and preparing brochures for the Durkin Brothers and Associates company, she had no involvement with the books or records. (See plaintiff's exhibit 11, 12, 13 and 14.) The defendant did inform her that on weekends when he and his CT Page 10026 brother collected the rents, that they would insist on cash whenever possible.
The parties differ in their claims as to the causes of the breakdown of the marriage. The wife cites the financial situation, the housing arrangements and general loss of love as the three broad categories which caused the breakdown. The husband claims that his wife could have provided him more emotional support and that love and affection were lacking.
The husband presented no instances or examples of any paucity of emotional support on the wife's part to support his claims. His only explanation of his claim that love and affection were lacking consisted of his testimony that in the last couple of years he observed that other married couples didn't behave the way she (his wife) did. He conceded that "based on what he had heard" in the plaintiff's testimony on the first day of trial that his marriage had irretrievably broken down.
The parties' life together in many ways appears to have been a sad coexistence. Their work hours often kept them apart. What might have been their shared time together, dinners and evenings, were often spent apart with the husband dining with his mother while his wife was alone next door with dinner. Except for the times when the parties were seeking alternate housing, it appears that the husband spent most of his weekend time with his brother.
The wife, thirty-eight (38) years of age, was employed full-time during the marriage until she sustained injuries in an automobile accident in June of 1991. Her earning capacity prior to the accident was approximately $31,000 per annum (see plaintiff's exhibit 4). During the years 1985 through 1990, she had a second job as a German teacher which generated approximately $5,000 to $7,000 per year additional income. Since the accident, she has not been able to return to work full-time. She has done some part-time consulting which generated approximately $3,000 to $4,000 of income in 1993, and $4,285 in 1994. Additional income in 1994 resulted from the plaintiff's liquidation of an IRA in the amount of $10,525. (Plaintiff's exhibit 10.) Currently, she attends the University of Connecticut School of Law and is not employed. She testified that the market for her consulting work is limited as the industry had passed her by while she was recuperating during her illness. She felt that obtaining a law degree might provide her with a more secure long term means of support. CT Page 10027
The plaintiff's injuries were as a result of an automobile accident which occurred when her vehicle was forced off the road. The other vehicle left the scene of the accident and was never found and, therefore, there is no prospect of any monetary recovery. The medical expenses resulting from the accident were between $150,000 and $200,000, at least $20,000 of which was paid by the wife from her own funds. She had approximately $4,000 to $5,000 in savings at the time of the accident which she used partially to pay the ambulance bill when presented with same by the defendant.
The wife's injuries, resulting from this accident, are set forth in the report of Dr. Martin Ross (plaintiff's exhibit 8).
One leg was broken in two places. The heel on her right foot was crushed. One knee was ripped open to the joint. Her nose, right arm and thumb were fractured, her left wrist compound fractured. She also received internal injuries. Her first hospitalization was for approximately four weeks. Within a week of her release, she developed an infection and returned to the hospital for approximately two weeks. She was subsequently hospitalized four to five times. She has undergone eleven surgical procedures, six major and five minor, the last taking place in March of 1994. After her initial hospitalization, the plaintiff went to her mother's home in Redding as her condition at that time required twenty-four hour care. She was unable to feed herself. Both the plaintiff and her mother testified that the proposed recuperation at the plaintiff's mother's home was discussed with the defendant. The plaintiff's mother indicated that she had invited the defendant to come to stay at her home with the plaintiff since she was recuperating in a large room which also had a sofabed for his use. The defendant claims he was not consulted or ever given the opportunity to care for his wife.
In September of 1991, while the plaintiff was still recuperating at her mother's home, the defendant telephoned her and indicated that he was tired of the medical insurance paperwork and was going to switch to a HMO. The plaintiff expressed concern about this change due to her pre-existing condition and the need to continue with the specialists who were then treating her and might not be on the approved list of providers. The defendant's response was that it was his insurance policy and chastised his wife for being "self-involved." At this point, the plaintiff was in a wheel chair. That night she CT Page 10028 suffered a pulmonary embolism which required a two week hospitalization. When released, she returned to her mother's home to recuperate for approximately eleven months. No financial assistance was provided to the wife by the defendant during her recuperation period. In July of 1994, by stipulation and court order, the defendant began paying toward the plaintiff's support the sum of $290 per week, not taxable to the plaintiff nor deductible by the defendant.
The defendant did cancel the existing insurance. As the plaintiff obtained a six month medical leave from her employment, her pay and health insurance benefits continued during that period. Her employer also paid her health insurance for one year beyond the medical leave. She later returned to work knowing she would be laid off so that she could access the available COBRA benefits.
In June of 1992, the plaintiff returned to the marital home in Bridgeport, still in a fracture brace and using a cane or crutches to assist her ambulation. She was faced with surroundings reminiscent of Miss Havisham's in Dickens' GreatExpectations. The refrigerator was replete with rotten food which the defendant indicated was left there since she had the accident in June of 1991. She found moths crawling in the food in the cabinets. Additionally, the home had been vandalized in September of 1991, according to the defendant, by an individual "on crack." The plaintiff gave the defendant an ultimation regarding the residence, stating that if she had been there when the incident had occurred, and lived through it, she would not have slept there another night. The defendant promised her that they would move to another house. They found a prospective residence, but the defendant then indicated that unless the plaintiff had half of the necessary funds, they could not purchase the property. When the defendant responded that she was not working and had no money, the defendant indicated that if she didn't like it, she could leave. She left for her mother's that night.
The plaintiff returned to Bridgeport for the last time in March of 1993, after another surgery where bone from her hip was removed and placed in her foot. She was then in a cast up to her thigh. Just prior to her arrival, there was a severe snow storm in Bridgeport. As she was taking blood thinners, and was concerned about falling and internal bleeding, she asked that the path be shoveled so that she could walk safely to the house. When she arrived and saw that no shoveling had been done, she simply CT Page 10029 broke down and cried. She left the home in April of 1993 and never returned again. The husband's testimony was that he was "shocked" when she moved out.
Her current medical condition leaves her in constant pain, although some days are better than others. Her foot is fused in place, so she is unable to run and has great difficulty walking on surfaces that are not completely even. One of her knees does not bend. One wrist does not turn any more, which creates difficulties for even simple tasks, such as opening doors, or jar caps, or holding a pot. She has permanent nerve damage in her wrist and arm. She has hip problems, bursitis, sciatica and walks with a permanent limp. Her gait is not natural and results in throwing her whole body "out of sync." Because of the problems with her bad knee, she overcompensates with her good leg which results in her having to stay off her feet completely when the good leg is strained. Future surgeries might possibly reduce the level of pain but would do nothing further to improve her condition.
The defendant's testimony regarding his health indicates a deterioration as a result of the stress of separation. He testified that he had a bad case of hypertension, the time of commencement unknown. Later, upon examination by his counsel, he added that he was diagnosed with some form of cancer five to six months prior but was essentially unable to provide any further details. He further testified that he has not been able to focus on things due to the time spent in court and in depositions, while admitting the only deposition was in July of 1993. The court takes judicial notice of the pleadings in the dissolution file which reflect minimal court activity.
The husband, forty-seven (47) years of age, is employed by Metro-North Railroad. He also has been involved during the marriage with his brother in a partnership for the investment purchase of rental properties known as Durkin Properties. Additionally, he and his brother are in the real estate sales business currently holding a Century 21 franchise.
On his financial affidavit submitted at trial, the defendant reflected his income from his railroad employment at a gross weekly wage of $763.06 or a net weekly wage of $408.20. This appears to be based on the pay stub for the pay period ending April 11, 1995, which reflects thirty-two (32) hours of regular earnings, plus 1.08 hours of "swing-time." These figures are CT Page 10030 substantially at variance with the year-to-date earnings of $21,824.09 reflected on that same pay stub. (Plaintiff's exhibit 15.) Using the year-to-date figure for earnings on exhibit 15, his average gross weekly income would be $1,454.93. Based upon the year-to-date net earnings reflected on that same pay stub, his average net earnings year-to-date, over the fifteen (15) week period reflected in the pay stub, would be $820.13. Exhibit 43 sets forth the husband's year-to-date Metro-North compensation through April 25, 1995. This indicates that the husband's year-to-date gross earnings were $23,725.41 with his net pay reflected as $13,411.06 for that time period. Again, taking the average compensation over the seventeen (17) week period reflected on exhibit 43 would yield gross weekly income of $1,395.61, and net weekly income for that same period of $788.88. The earnings history report also sets forth a breakdown of year-to-date hours worked reflecting a total of 699.24 hours. This would result in an average of 41.13 hours per week for that seventeen (17) week time period. The court finds that Mr. Durkin's May 5, 1995 financial affidavit inaccurately reflects his true income from his employment with the railroad. The court further finds that the most accurate reflection of his compensation from that employment is found on plaintiff's exhibits 15 and 43.
The husband's financial affidavit submitted at trial reflects no income from any other source. His federal income tax returns from 1988 through 1994 reflect that he consistently received not insignificant sums from interest and dividends. In the three calendar years preceding the institution of this dissolution action, the husband's interest and dividend income from bank accounts and stocks and bonds was almost $6,000 in 1990, just under $6,500 in 1991, and in excess of $4,600 in 1992. (Plaintiff's exhibits 3, 4 and 5.) In 1993, the year in which the divorce was filed, the interest and dividend income drops to just under $2,000, and in 1994 was approximately $2,200. (Plaintiff's exhibits 6 and 7.) The defendant testified that he had sold, transferred or otherwise liquidated and disposed of assets during the pendency of this action, despite the May, 1993 order of the court not to do so. Although he shows no income from the Durkin Properties partnership in which he is an equal partner with his brother, a review of the tax returns for the period 1992 through 1994 would indicate that when depreciation is added back in, the rental properties not only pay for themselves but provided a profit of approximately $13,000 in 1992, $21,000 in 1993, $14,000 in 1994. (Exhibits 34, 35 and 36.) One-half of that actual income CT Page 10031 would be the defendant's. Most of the real properties in which the husband invested were purchased during the marriage as reflected by the deeds and evidence. (Plaintiff's exhibits 16, 17, 18, 19, 20, 21, 22, 23, 24, 25.) He claims that little if any profit was ever realized from the sale of any of these properties. He also claims that the profit, if any, was almost always put back into the partnership. The evidence reflects that the 833-835 Kossuth Street property was purchased in 1984 for $40,000 and sold in 1986 for $123,000. (Plaintiff's exhibit 17.) The evidence further reflects that 693-695 Kossuth Street was purchased in 1984 for $38,000 and sold in 1987 for $135,000. (Plaintiff's exhibit 18.) The Stillman Street property was purchased in 1985 for $61,000 and sold in February, 1988 for $249,000 (Plaintiff's exhibit 19.) The defendant's claim of minimal profit generated by the sales is based on his assertions that the cost of renovations to the properties plus the mortgages resulted in minimal profit at the time of sale. He presented no documentation of the cost of the renovations or for the existence of any mortgages but for the testimony of his brother and partner, T.R. Durkin. Specifically, the brother testified that the 833-835 Kossuth Street cost of renovations was for four units at approximately $15,000 each or a total of $60,000. Similarly, he indicated that the renovations to the 693-695 Kossuth Street were a total of approximately $60,000. Regarding the Stillman Street property, it was his testimony that the renovations were made to six units at approximately $18,000 each or a total of $108,000. He also indicated that there were mortgages on all of the properties but did not specify what the amount of any of these mortgages was.
The deed reflecting the sale of the Stillman Street property is dated February 26, 1988. (Plaintiff's exhibit 19.) The deed reflects a sales price of $249,900. This sale was reported on the husband's 1988 federal income tax return. (Plaintiff's exhibit 1.) He reports the sale in the amount of $124,950, precisely one-half of the sales price for this property which had been held jointly with his brother. The basis of the property indicated on the tax return is $30,500 or precisely one-half of the original purchase price of $61,000. No increase in the basis of the property applicable to the claimed total of $108,000 of improvements made to the property is reported on the federal tax return. In assessing the information on the tax return, the court notes that the husband's educational background consists of a bachelor's degree plus a master's degree in business and finance. The court also notes that the mortgage payments for the Stillman CT Page 10032 Street property are listed for the year 1988 on the supplemental income schedule as a total of $282 which would indicate the existence of a relatively insignificant mortgage on this property. Based upon, the blatant contradiction with the information supplied to the federal government, the testimony of the plaintiff and his brother regarding their investment properties, is found not to be credible by this court.
During the pendency of this action, and again in violation of the restraining order entered in May of 1993, the plaintiff transferred numerous properties to his sister. On September 1, 1994, three properties on North Avenue in Bridgeport were transferred for the consideration of $1 and "other valuable consideration." (Exhibits 28, 29 and 30.) Also, on September 1, 1994, the property located at 421 Bishop Avenue was transferred by the husband to his sister again, for consideration of $1 and "other valuable consideration." (Plaintiff's exhibit 31.) On that same date, property located at 1150 Wood Avenue was transferred to Johanna Durkin, the wife of the defendant's brother, T.R. Durkin, for $1 and "other valuable consideration." (Plaintiff's exhibit 32.) He testified that the reason for the transfer of all of the properties to his sister was to avoid another pending suit by the Villanos which related to the Noble Avenue property. Earlier in his testimony, he had indicated that he and his brother still owned and managed the 421 Bishop Avenue property in Bridgeport by collecting rents and paying expenses. Later, when presented with the deeds evidencing the transfer to his sister, he indicated that he was not involved in collecting the rents and paying the expenses, but he believed that his brother did continue to collect the rents. He indicated that he "thought" his sister was paying the mortgage on the 1358 North Avenue mortgage, the balance of which he estimated to be $110,000 to $120,000. He testified that his sister, who lives in California, is not holding anything for his benefit, indicating, "We only transferred the property, I don't know what other arrangements were made." The court notes in this regard that the evidence presented at the time of trial indicated that the legal dispute with the Villanos, the purported reason for these transfers, had been resolved. When questioned on the value of the North Avenue properties and presented with his July 26, 1993 financial affidavit, which reflected a value of $50,000 for 1342 North Street, $80,000 for 1350 North Street, and $75,500 for 1358 North Street, he conceded that at that time all three properties were indeed listed for a total market price for $539,000. (Plaintiff's exhibit 33.) CT Page 10033
In December of 1994, again in violation of the court order of May of 1993, the defendant sold property located at 931-934 Noble Avenue in Bridgeport. (Plaintiff's exhibit 27.) This sale was reported on Schedule 4797 of the Durkin Properties 1994 partnership tax return. (Plaintiff's exhibit 36.) In assessing the defendant's credibility regarding the transfers of properties to his sister, and whether or not she is holding anything for his benefit, the court notes that the 1358 North Avenue and 421 Bishop Avenue properties are reflected as owned by the partnership on Form 8825 of that same document. No schedule of sale or exchange of those parcels is reported for the year 1994. The court also notes, in comparing the partnership returns for the years 1992, 1993 and 1994, that the expenses claimed to have been paid by the partnership for those two parcels are significantly similar. (See plaintiff's exhibit 34, 35 and 36.)
In 1993, the defendant sold $32,577.68 worth of stocks and/or securities. Approximately $5,000 was liquidated in early 1993, prior to the commencement of this dissolution action. Almost $19,000 was liquidated after service of the dissolution papers on the defendant and only three days prior to the stipulated restraining order entered in May of 1993. Subsequent to the restraining order, approximately $10,000 of additional securities were sold during the period July of 1993 through December of 1993. (Plaintiff's exhibit 6.) The defendant's testimony was that he had to sell these "to pay expenses" and he indicated that he put the proceeds "into an account" to pay bills. When he was asked into what account he deposited the funds, there was no response.
In 1994, the defendant liquidated $4,785.42 of stocks and/or securities, again in violation of the May, 1993 court order. His federal income tax return indicated receipts of dividends from numerous stocks which he owned during that year including Conrail, Inc., A.T.T. Corporation, Amoco Corporation, Bristol-Meyers Squibb, Cincinnati Bell, Bell South Corporation, Southwestern Bell, and Utilcor United, Inc. His financial affidavit presented at trial reflects that he currently owns only McDonald's stock, A.T.T. and Amoco. He testified that he believed he had sold more stock in 1995, but "did not know how much."
The plaintiff and his brother also engage in the sale of real estate. Originally, this business (a separate entity from the CT Page 10034 Durkin Properties Partnership) was known as Durkin Brothers 
Associates, Inc. and it is now known as Century 21/Durkin Real Estate, Inc. The plaintiff shows no income from this entity on his financial affidavit presented to the court. The tax returns for this S corporation reflect gross receipts of $7,970 in 1992, $34,080 in 1993, and $76,856.69 in 1994. (Plaintiff's exhibits 38, 39 and 40.) The plaintiff was unable to explain the fact that the tax return shows compensation of officers in the amount of $9,630 for the year 1994. He testified that in 1995, approximately ten sales of real estate had been made, and using an average of less than $3,000 commission per sale, he estimated gross receipts of $20,000 to $25,000 total as of the date of trial. He further testified that approximately four or five further sales were pending at the time of trial. He was unsure of the number of sales that he had made personally, indicating it was one or two or "maybe three sales." In 1994, he estimates that he personally made ten sales. His financial affidavit filed on July 5, 1994, at the time of the entry of the temporary financial awards, showed no income from commissions. He further testified that in 1993, he had probably made the same amount of sales personally, although it could have been less. His financial affidavit, dated July 26, 1983, shows no income from any source other than his employment with the railroad. (Plaintiff's exhibit 33.) The defendant's affidavit reflects his stocks and Benham Income and Growth and Fidelity Utilities Income funds accounts as jointly held with his brother, T.R. Durkin. When questioned on this claimed joint ownership, he conceded that his brother had not contributed any funds towards the acquisition, nor did he believe that his brother had ever reported dividends from the stocks.
Although not reflected on his financial affidavit, the defendant has a Metro-North defined contribution pension plan which is held at the Vanguard Group. This account had a value of $15,352.78 as of April 30, 1995. (Plaintiff's exhibit 41.) Additionally, although also not reflected on his financial affidavit, the defendant has a two tier retirement plan by virtue of his employment. The monthly benefits to which he would be entitled, estimated based upon his railroad employment through December of 1993, would be $1,232 from the Tier I benefit component and an additional $580.40 from the Tier II benefit component. (Plaintiff's exhibit 42.)
In determining the proper orders in this case, the court must consider the factors set forth in sections 46b-81 and 46b-82 of CT Page 10035 the General Statutes, together with the provisions of section46b-62.
The court has considered all of the criteria of sections46b-81 and 46b-82 of the General Statutes, together with the provisions of section 46b-62 and all of the evidence and the case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account"; Scherr v. Scherr, 183 Conn. 366,368 (1981); this court will not recount those statutory criteria and the evidence, other than as has been previously stated. "The court is not obligated to make express findings on each of these statutory criteria." Weiman v. Weiman, 188 Conn. 232,234 (1982). Suffice to say that the court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding; Leo v. Leo, 197 Conn. 1, 5
(1985); and that the court need not give equal weight to each factor. Kane v. Parry, 24 Conn. App. 307, 313-14 (1991).
The court, in addition to the foregoing findings, finds as follows:
1. The defendant's weekly average gross income from his railroad employment is found to be $1,395.61.
2. The defendant's weekly average net income from his railroad employment is found to be $788.88.
3. The defendant's income from commissions for sales of real properties is found to be, at minimum, $10,000 per annum.
4. The defendant's compensation as an officer of Century 21/Durkin Real Estate is found to be, at minimum, $4,815 per annum.
5. The defendant's one-half share of the total income, less depreciation of the Durkin Properties partnership is, at minimum, $7,471.12 per annum.
6. The defendant's dividend and interest income is found to be $2,200.
7. The evidence presented by the defendant lacked credibility. CT Page 10036
8. The defendant, in direct violation of a court order prohibiting him to do so, disposed of and/or otherwise transferred assets consisting of the following:
(a) 1358 North Avenue, Bridgeport
(b) 1342 North Avenue, Bridgeport
(c) 1358 North Avenue, Bridgeport
(d) 421 Bishop Avenue, Bridgeport
(e) 1150 Wood Avenue, Bridgeport
(f) 931-934 Noble Avenue, Bridgeport
(g) approximately $10,000 of stocks and/or securities in 1993
(h) approximately $4,700 of stocks and/or securities in 1994
(i) further stocks and/or securities of undisclosed amount in 1995 Many of these transfers were effectuated by the defendant for substantially less than full consideration.
9. There is no evidence of a mortgage on the Bishop Avenue property as reflected on defendant's financial affidavit.
10. The weightier and more credible evidence leads to the conclusion that the defendant was primarily at fault for the breakdown of the marriage.
11. The testimony of the plaintiff was credible and virtually unrefuted by the defendant.
12. The defendant has, through his own wrongful conduct, limited the financial evidence available to the court.
13. The financial contributions by the plaintiff throughout the marriage contributed to the defendant's ability to acquire and/or preserve assets.
14. The lack of financial contribution by the defendant to the plaintiff was instrumental in the depletion of the plaintiff's assets. CT Page 10037
15. The court has jurisdiction of the parties and the allegations have been proven and are true.
Based upon all of the foregoing, the court enters the following orders:
1. The husband shall pay to the wife, as periodic alimony, the sum of $400 per week, payable until the death of either party, or the wife's remarriage, or five years after her graduation from law school, but in no event longer than eight (8) years. Upon the happening of the first of those events, alimony shall cease and terminate. This order shall be subject to an immediate wage execution payable directly to the plaintiff.
2. The husband and wife will both receive certain pension benefits from the Railroad Retirement Board as a result of Tier I benefits. With regard to Tier II benefits which are assignable, the court orders that benefits be paid to her in accordance with the Railroad Retirement Act on a percentage basis, as a substantial portion of the benefits have accrued during this marriage. The court retains jurisdiction in this matter until documentation has been accepted by the Railroad Retirement Board ensuring the benefits due the wife. The order of the court is as follows:
 Constance Durkin is awarded and the Railroad Retirement Board is directed to pay, an interest in the portion of Raymond F. Durkin's benefits under the Railroad Retirement Act (45 U.S.C. § 231 et seq.) which may be divided as provided by Sec. 14 of the act (45 U.S.C. § 231m). Constance Durkin's share shall be computed by multiplying the divisible portion of Raymond F. Durkin's monthly benefit by a fraction the numerator of which is the number of years Raymond F. Durkin worked for a railroad employer during the period of the marriage (October, 1982 through May, 1995), and the denominator of which shall be Raymond F. Durkin's total number of years employed by a railroad employer at retirement, and then dividing the product by two.
3. The Vanguard account shall be equally divided between the parties. The wife's attorney shall prepare a proposed Domestic Relations Order equally dividing that account. This shall be accomplished as a roll-over from the husband's 401K to the wife's IRA so there will be no tax consequences for either party. The court will retain jurisdiction in this matter until the transfer has been accomplished. CT Page 10038
4. The Benham Income and Growth and Fidelity Utilities Income funds shall be equally divided between the parties, and the wife's counsel shall prepare a proposed Domestic Relations Order equally dividing those accounts. The court will retain jurisdiction to ensure effectuation of this order.
5. The husband shall designate the wife as the beneficiary of all of the husband's life insurance, both group and private policies, until such time as his obligation to pay alimony has terminated.
6. The husband shall pay to the wife, as a lump sum property settlement, the sum of $100,000, payable as follows:
 $20,000 on January 1, 1996; $20,000 on or before June 1, 1996; $30,000 on or before January 1, 1997; $30,000 on or before June 1, 1997. Security shall be given for this obligation by placing a judgment lien on all of the various properties in which the husband has an interest including, but not limited to, the three properties on North Avenue, the Bishop Avenue property, 1041 Noble Avenue, Wood Avenue and Coleman Street.
7. Having considered the other financial orders in this decision, the court finds that if it were not to make an award of counsel fees to the plaintiff, the absence of such an award would undermine the other financial orders in this case. Accordingly, the husband shall pay, on behalf of the wife, counsel fees in the amount of $5,000, payable within thirty (30) days.
Dennis, J.